ROBERT MYERS, APPELLANT, vs. BENJAMIN F. NOURSE, ADMINISTRATOR OF O. C. RAYMOND, DECEASED, APPELLEE.

1. Ten years is not a reasonable time within which to perfect the title, after objections by purchaser, under a judicial sale by the Master, of real estate.

2. Where time is given, the party should be put under terms to procure the title speedily.

3. The practice of allowing time to perfect title not encouraged; the Court and parties should take care before hand that the title is in a state to be sold.

4. A material distinction exists between the actual existence of the title, and the state of the evidence of the title; in the latter event, the Court may give time to reform and amend it.

5. A purchaser not permitted to cast about for a title, after a judicial sale; Lord Redesdale's rule in selling land under a decree of Court commended.

Appeal from Franklin County Circuit Court.

Benjamin F. Nourse, administrator of Raymond, filed his bill in Chancery against A. K. Allison, and others, claiming that certain town lots in Apalachicola, conveyed by the Trustees of the Apalachicola Land Company to O. C. Raymond and said A. K. Allison, were held by them as tenants in common, and charging that said Allison mortgaged said lots to certain creditors of the firm of Raymond & Allison, for more than was really due, and prayed for a receiver, &c. .

It appears that O. C. Raymond and A. K. Allison had been partners in trade, and as such, and for the use and benefit, and for the purposes of the partnership, had purchased the lots in question, and had erected a brick building or store thereon. After the death of Raymond, Allison, as surviving partner, mortgaged the lots, to secure the payment of $7000, alleged to be due to the firm of Morgan & Barker, of New York, by Raymond & Allison. At Fall Term 1843, by consent of parties, a decree was entered cancelling the mortgage executed by Allison to Morgan & Barker, and ordering the said lots to be sold by Benjamin F. Nourse, receiver, after giving public notice of the time and place of sale, on terms of one fourth cash, and the remainder in six, twelve and eighteen months, with good joint and several notes for security, and no title to be given until said notes were paid. Nourse, as administrator, was to join in the sale.

and in making titles. Pursuant to this decree, the two town lots in question were offered at public sale, to the highest bidder, on the 22d day of March, 1844, and the same were purchased by Robert Myers, for $6,100. Of this amount, $1,525, being one fourth, were paid in cash, and Myers gave three notes, each for $1,525, payable respectively in six, twelve, and eighteen months after date. As a further security, the receiver required that Myers, the purchaser, should cause the property to be insured, for the sum of $4,000, and should regularly assign to him the policy of insurance.

On the 9th day of December, 1844, Robert Myers filed his petition in Franklin Circuit Court, alleging that D. B. Wood and N. J. Deblois, who were partners, were jointly interested with him in the purchase of said lots, and that the sole object which they had in view in purchasing said lots and the buildings thereon, was the adaptation and conversion of said property, with other contiguous property belonging to them, into a cotton warehouse; that in case the title acquired by them should be defective, the purposes for which the purchase was made would be frustrated, and the lots would be of much less value to them. He further alleged that he had been advised by his counsel that the decree under which the sale was made was erroneous, and that the title acquired by said purchase was defective, and prayed the Court to review its decree, and if it should appear that the sale made by Nourse under said decree, did not operate to convey a good title, that the said sale might be rescinded.

On reading the petition, and after argument of counsel, the Court decreed that the title obtained by Myers, under the sale made by the receiver, was not complete, because the judgment creditors of A. K. Allison, as surviving partner of Raymond & Allison, who obtained judgments prior

to the rendition of the decree ordering the sale, on the lia-
bilities of the firm, and because the heir, or heirs, or dis-
tributees of O. C. Raymond, deceased, ought to have been
made parties to said decree. But inasmuch as the Court
was of opinion that Nourse, administrator, &c., ought to
have further and reasonable time to perfect said title, and
remove all objections thereto, the prayer of the petition, so
far as it related to the rescinding of the sale, was refused ;
and it was further ordered that Nourse should proceed, by
proper steps, to bring in the creditors of Raymond & Alli-
son, and the heir, or heirs, and distributees of O. C. Ray-
mond, to test their claims, or the claim of any of them, to
said lots, if any they have, or pretend to have, and to do
such other matters and things as might thereafter appear
to be necessary to render the title to Myers secure. It was
at the same time ordered that Myers have the possession
of said lots.

On the 20th March, 1845, Nourse filed his amended and
supplemental bill, making the creditors of Raymond &
Allison, and the infant heir of O. C. Raymond, parties
thereto, in conformity to the previous order of the Court.
On the same day, an order was made appointing A. G.
Semmes guardian *ad litem* for the infant heir of Raymond,
and ordering subpoenas to issue against such of the parties as
were within the jurisdiction of the Court, and publication
to be made, as required by law, as to such of the parties as
were non residents ; which was accordingly done.

On the 16th of April, 1846, Robert Myers made an affi-
davit in support of his application for a rescission of the
purchase made by him, in which he alleged that since said
purchase, D. B. Wood and N. J. Deblois, who were inter-
ested with him, became unable to comply with their part
of the contract, and that he, Myers, was unable to carry
out the same by himself, out of his own means ; that the

object in making said purchase, was to convert said property, with the adjacent property, to the purposes of warehousing cotton, but from the losses of said Wood & Deblois, they were unable to carry out said intention, and that the property is of much less value to them for any other purpose. Myers further alleged that had he and his associates obtained a good title to said property at the time of the purchase, they could and would have since sold the same for the same price agreed to be paid for it by them, but were prevented from doing so by the cloud that hangs over the title.

On the 22d day of April, 1846, an order was made, granting leave to complainant to amend his supplemental bill, by making A. K. Allison a defendant, who appeared by his solicitor, and agreed to answer said bill in thirty days. It was at the same time further ordered that a decree *pro confesso* be entered against all the parties defendant, except the infant heir of O. C. Raymond, and that his guardian *ad litem* have thirty days to file an answer.

On the 25th April, 1847, Nourse filed his amendment to his supplemental bill, making A. K. Allison a defendant thereto.

On the 26th January, 1847, the answer of the infant heir of O. C. Raymond, by his guardian *ad litem* was filed.

On the 14th day of December, 1853, a motion was made, on behalf of Myers, to be discharged from the purchase aforesaid, because Nourse had not completed the title to said lots, and because the delay to do so had been unreasonable. In support of this motion, Myers, on the 15th day of December, 1853, filed an affidavit, in which he renews his application, upon the ground taken in his former applications, and also alleging that in 1847 the buildings upon the lots were destroyed by fire, and thereafter the lots were suffered to remain vacant, because he had no means to im-

prove them, and because, had he the means, the defect in
the title discouraged him from so doing. He also alleges
that he and his associates had not, since the filing of the
first petition, been willing to take a title to said lots, but on
the contrary, counsel had ever since been retained to op-
pose a confirmation of the sale.

On the 16th day of December, 1853, Nourse filed a state-
ment by way of response to the petition of Myers, in
which he sets forth the various orders and proceedings in
the cause, and showing that from April Term 1847, to De-
cember Term 1853, the Judge who presided was disquali-
fied to try the case. He also alleges that at December
Term 1846, he could have pressed for a decree of confirma-
tion, but as the amount of Insurance money claimed, viz:
$4,000 was expected at once to accrue to the fund and thus
obviate nearly all cause of dispute, it was thought by him-
self and counsel unnecessary and harsh towards Myers to
press the motion at that time. He further states that by
the fault of Myers or his associates in not keeping the poli-
cy of Insurance in the name of the receiver, great delay
in collecting the money occurred. The policy of insurance
was allowed to stand in the name of D. B. Wood & Co.
After the fire which destroyed the buildings and before any
formal claim could be sent by the Receiver, the creditors
of D. B. Wood & Co., attached the money in the hands of
the Insurers. A contest arose involving an expense to the
fund, which did not end until January 1850, and then only
by the withdrawal of the claim put in by the creditors of
D. B. Wood & Co.

To this delay in getting the Insurance money and to the
absence of a qualified Judge for every term since 1847,
Nourse alleges, must be attributed the absence of action on
his part.

522                        SUPREME COURT,

Myers vs. Raymond's Adm'r.—Opinion of Court.

Afterwards and at December Term 1853, the Court refused the application of Myers for a discharge and directed the master to make a title to the lots, from which decree Myers appealed.

*W. G. M. Davis*, for appellant.

*George S. Hawkins*, and *Archer & Papy* for appellees.

BALTZELL, C. J., delivered the opinion of the Court:

In the year 1844, Robert Myers filed his petition, praying to be released from the purchase of two lots lying in Apalachicola, purchased by him at a sale made by a receiver or master in Chancery under a decree of Court, to which he insisted he got no title. The sale was made at the instance of Nourse, admr. *de bonis non* of O. C. Raymond, and the Court on the hearing of the case adjudged "the title incomplete for want of the heirs of O. C. Raymond and the creditors of Raymond & Allison and gave farther and *reasonable* time to the plaintiff Nourse to perfect the title and remove all objections to the same." This decree was made in 1844 and from that time to 1853 the party had not complied, and it was only at the December Term of the latter year, the requisite steps and testimony were taken to obtain a decree making the title sufficient in the opinion of the Court.

This tardy action can scarcely, in our opinion, be regarded as a compliance with the order allowing time. The plaintiff alleges, and has urged, that he used due diligence and every proper exertion. Admitting this, it shows very conclusively that a title requiring the labor of near ten years to complete, is not of a kind to be forced upon a purchaser. Surely such a period could not have been contemplated by the Chancellor when making the order. The bare suggestion of so long a time would have struck him with amazement, as unreasonable and unprecedented.

In an affidavit filed at a later period of the case, still objecting to the purchase, the purchaser states " that his object in buying the property, to wit: the erection of a cotton warehouse, has been defeated by the erection of other buildings sufficient for the purposes of trade—that the partners associated with him have failed and that real property in Apalachicola has depreciated to an extent which prevents investment and makes it not desirable to him. The buildings erected upon it, too, have been burnt down, leaving only the naked ground, and that if he had obtained the title when he contracted for it, he could have sold the property so as to secure himself against loss."

These allegations, if true, show the great injury of delay, and the necessity for despatch and promptness in this, as the other affairs of life. They show conclusively, we think, that a reasonable time for such an object as that contemplated in the present case, any where, and especially in a commercial community, would by no means extend to the period claimed. But apart from this, the usual order in Chancery, " on a Report of the Master that the vendee *will have a* title is, to put under terms to procure that speedily." 2 Danl. Ch. Prac. 1415; Coffin. vs. Cooper, Vesey, 205, and that we apprehend should have been the order in the present case.

But apart from this, we are of opinion that the attention of the Court should have been directed to the state of the title at the time the objections to it were first considered. A material distinction is this, (says the Chancellor, in Meginnis vs. Fallen,) which is to be remembered : the actual existence of title at the time of objecting, and the then state of the evidence of that title. If the title stands ultimately as from the first by the abstract, yet the evidence given of that title differs ; if that be so, it is not altering the title, but adducing additional evidence, &c. The requiring additional

18

evidence of title to be supplied by the vendor is consistent with the rule of not keeping the purchaser too long in the suspense of investigation, and the question always is whether it is *the same title* as existed at first that is followed up, or whether the vendor has been put *to cast about for a new title*."

"Again, not what the title is *now*, but what it was when the master ruled his objections, was the state of title to be pronounced upon." 2 Mallory, 561. Tested by this rule, the order giving time to complete the title was improper, as then the administrator had no title and had nothing to sell. If suit had been instituted by him against the creditors and heirs, to settle and adjust the estate of his intestate, O. C. Raymond, pay the debts, &c., and sell the real estate for this purpose—or if a like suit had been instituted against the surviving partner of the firm of Raymond & Allison, alleging mal-administration of their affairs, calling in the creditors and the heirs of Raymond, and in the course of the administration by the court, of the affairs of this concern, it became necessary to sell the real estate to pay debts, we are not prepared to say that a sale might not have been had on such a showing. But the case before us is not of this character. The bill and supplemental bill both allege that the property sold was *individual property*, and not that of the firm, and that on the death of *Raymond* it *descended to his heirs*. There is neither allegation nor proof that it was necessary to pay his debts. According to the bill, it does not appear that it was necessary to pay the debts of the firm, or that its assets had been exhausted. Surely, upon every principle, before resorting to the real estate of an individual deceased partner, the joint effects, assets and property of the partnership should be first disposed of. If sold for purposes of division, as intimated in the decree, it was wholly unwarranted, as the

administrator had nothing whatever to do with this. The suit was originally instituted with other parties, to avoid an illegal arrangement made in reference to a mortgage on the property, and on settling this with the party interested, the order for the sale of the property was made. It is insisted that plaintiff sold the interest of Raymond & Allison " only as far as he was legally authorized, as Master, to sell ;" then, in our view, he was not authorized to sell at all. The decree, however, does not admit this interpretation, nor justify this addition. It recites " that the principal estate of Raymond & Allison consists in his houses and lots, to which all adverse claims are now released, and directs the property to be sold, and no title to be given until after payment of the last notes." It contains no direction to the master to sell " *the interest so far as he was authorized*," and if the result were to make a purchaser pay $6,000 without getting any title, and leave him subject to be dispossessed by the rightful owner, then we say that no such design can be attributed to the Court ; so far from it, the order made on discovering the state of the title shows, that they considered the purchaser entitled to a good title, and such a deduction a purchaser would be entitled to draw from the terms of the decree.

It is said again, that the purchaser was let into and continued in possession. This was in conformity to the sale and consistent with the order of the Court overruling his objection to the title and giving further time to complete it. His retaining the possession was an appropriate respect to the order of the Court, and should not be construed to his prejudice.

It is again urged that both parties should have been active in procuring the title. The decree directing the vendor " to proceed to bring the parties interested before the Court, and to do such other matters and things as may be necessary

to render the title of said Myers to said property secure," is the best answer to this objection.

Again, that plaintiff was not guilty of laches. Of this we are by no means satisfied, and if we were, how is the case of the purchaser affected by it? If the vendor, with all due industry and exertion, cannot get the title, is the vendee to wait and to be held on until by extraordinary effort and exertion he can succeed? We think not. He bargained for the title; not getting it, he objected and complained to the Court; they order him to wait a reasonable time; he waits until nearly ten years elapse, and still no title. If not the fault, it has been the misfortune of the vendor not to get it in due time; but surely this should not be visited upon his purchaser, who, during all this time, has been neither owner nor released from his bargain, not at liberty to sell nor improve, nor to invest his money in other property but liable to be called upon for the residue of the purchase money of $6,000, whenever the sale should be confirmed. We are of opinion, then, that this purchaser has a clear right to be relieved. Whilst on this subject it may not be amiss to state that the English Courts have a rule, introduced by Lord Redisdale, the great Equity pleader and Judge, which is declared to be an excellent and salutary resolution, that "lands shall not be put up to sale and the parties embarrassed with a purchaser until a true state of the title, with the counsel's opinion thereon, be produced and title deeds deposited." 2 Sch. & Lef., 738. If the contract is regarded to be made by the purchaser, with the Court, as some of the authorities hold, then indeed very great caution and care would seem to be requisite that nothing wrongful or injurious be done, and that the utmost good faith and propriety prevail; this is due to the Court itself and to protect public interests from jeopardy. We do not hesitate to say that the practice of perfecting a title after

a sale should not be encouraged. Besides inviting looseness and irregularity on the part of the Court and parties, it reverses the regular order of proceeding, by beginning where it should end, assuming jurisdiction, then striving to maintain it; selling property and then seeking to get the title to it. It is as if a workman should construct his edifice of frail materials in the hope of perfecting it by patchwork afterwards. In this respect we would discriminate between substantial objections, and those that do not enter into the intrinsic merits of a title.

In disposing of this matter finally, the Court below will cause an account to be taken of matters proceeding from this relation of the parties, crediting Myers with the purchase money paid by him with interest, and charging him with such sums as he may have received, or may be justly chargeable with, on account of the purchase, whether of rents, and the like. The subject of expense in procuring the insurance, will be a proper subject of consideration, adverted to in this Court, but we have not the means of determining it.

It is therefore decreed and ordered, that the decree of the Circuit Court ordering the sale of the two lots in Apalachicola at the instance of Nourse, administrator of Raymond, and the subsequent orders confirming said sale and the purchase thereof by Robert Myers, be set aside and reversed, and that he be releived therefrom, and the cause remanded to the Court below, that an account be had and taken between the parties, of the sums due and chargeable to each on account of the said sale, and for other proceedings to be had in conformity with this opinion and the principles of Equity.